Filed 2/14/14  P. v. Isida CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE, | B245442 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA096176) |
| v. | |
| ROBERTO A. ISIDA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Tia Fisher, Judge.  Affirmed in part and reversed in part.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Roberto A. Isida appeals from his convictions of aggravated sexual assault and continuous sexual abuse of his granddaughter, O.D.[1] He contends the trial court prejudicially erred in: (1) denying his motion to suppress statements obtained in violation of his *Miranda* rights;[2] (2) admitting evidence that he had a sexual encounter with a consenting adult in the presence of his teenage daughters; (3) excluding evidence that the victim made an alleged false accusation against another person; (4) allowing the jury to convict him of both continuous sexual assault and an aggravated sexual assault occurring during the same time period; (5) failing to instruct the jury that they could not convict of both continuous sexual assault and an aggravated sexual assault occurring during the same time period; and (6) imposing a $240 restitution fine. We dismiss the continuous sexual assault conviction and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *People's Case*

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence established that defendant had one son (Robert)

---

[1]  Defendant was charged by amended information with aggravated sexual assault of a child, sexual penetration (Pen. Code, § 269, subd. (a)(5)) (counts 1, 3, 5); aggravated sexual assault of a child, sodomy (Pen. Code, § 269, subd. (a)(3)) (count 2); aggravated sexual assault of a child, oral copulation (Pen. Code, § 269, subd. (a)(4)) (count 8); continuous sexual abuse (Pen. Code, § 288.5, subd. (a)) (count 4); sexual penetration with a child (Pen. Code, § 288.7, subd. (b)) (count 6); and oral copulation with a child (Pen. Code, § 288.7, subd. (b)) (count 7).  After the close of evidence, the People dismissed counts 3 and 5.  The jury convicted defendant on counts 1 and 4, but found him not guilty of counts 2, 6, 7 and 8.  After denying defendant's motions to set aside the verdict and for a new trial, the trial court sentenced defendant to 15 years to life in prison comprised of 15 years to life for aggravated sexual assault, sexual penetration (count 1); it struck the conviction for continuous sexual abuse (count 4) "for purposes of sentencing."  Defendant timely appealed.

All further undesignated statutory references are to the Penal Code.

[2]  *Miranda v. Arizona* (1966) 384 U.S. 436.

2

and four daughters (Lizbeth, A.I., R.I. and M.I.).[3]  Born in Mexico to Lizbeth, O.D. was about five years old when she came to the United States in 2004.  By 2007, O.D. was living with her mother and her four younger brothers in an apartment in El Monte. Defendant lived in a two bedroom apartment in the same building (apartment 207) with maternal grandmother, M.I., R.I. and Robert.  When O.D. occasionally slept over at her grandparents' apartment, she slept in the room M.I. and R.I. shared, on the floor between their twin beds.  By late 2010, the maternal grandmother had moved out and in early 2011, Lizbeth and her children moved in to live with defendant, M.I., R.I. and Robert.

Beginning when O.D. was 8 years old and until she was 11 years old, defendant sexually abused O.D.  At trial, O.D. described eight specific incidents all occurring when she was either visiting or living in apartment 207.  O.D. knew that the way defendant was touching her was wrong, but she did not know what to do about it.  On at least one occasion, O.D. told her mother (Lizbeth) that defendant would not leave her alone, but did not specify what he was doing to her and Lizbeth did not inquire.  But in the early morning hours of August 29, 2011, Lizbeth woke O.D. up and asked if she had felt defendant lying next to her.  O.D. said she had not, but in response to additional questions admitted that defendant had been sexually abusing her.  When O.D. came home from school that day, Lizbeth took her to the police station where she told the officers what defendant had been doing.

At the time of trial, O.D. was in foster care and wanted to return to her mother's home.

Lizbeth testified that she never noticed anything unusual when defendant and O.D. were together; O.D. did not seem upset after spending time with defendant.  Defendant played with all of the children and was not particularly affectionate towards O.D. Sometime in 2009, maternal grandmother told Lizbeth that she had observed O.D. spray perfume on her vagina.  In response to Lizbeth's inquiry, O.D. said it was so that defendant would stop doing things to her.  Lizbeth did not ask O.D. what she meant.  On

---

[3]     In August 2012, defendant testified that Roberto was 27 years old, Lizbeth was 26, A.I. was 25, R.I. was 16 and M.I. was 14.

3

August 29, after Lizbeth came home in the early morning hours and saw defendant in the living room near O.D., Lizbeth woke O.D. and asked if she felt defendant near her while she was asleep. O.D. said she did not. With the perfume incident in mind, Lizbeth asked O.D. if defendant had done anything to her in the past. O.D. answered affirmatively. When O.D. came home from school that day, Lizbeth asked her again whether defendant had done anything to her. O.D. said defendant had touched her private parts several times, but she did not give any details. Lizbeth did not talk to defendant again until several months later when the police arranged a phone call in which Lizbeth was to try to get defendant to say something about what he had done to O.D.

Defendant was arrested in New Mexico in November 2011 and extradited to California. On December 15, 2011, Detectives Jimmie Pitts and Carlos Molina interviewed defendant at the El Monte police station. A video recording of the interview was played for the jury and they were provided a transcript of the interview, in both Spanish and English. After initially denying any misconduct, defendant eventually confessed to sexually abusing O.D. three or four times by placing his finger in her vagina. Defendant said that O.D. would come into his room and he would tell her to leave, but she would take his hand and put it into her pants. Defendant denied any other sexual conduct with O.D. Defendant knew that, as an adult, he should not have let it happen.

B.    *Defense Case*

M.I. and R.I., both testified. Each confirmed that before O.D. moved into apartment 207, she occasionally slept on the floor in between their twin beds. M.I. and R.I. denied ever observing any sexual contact between O.D. and defendant. Each described themselves as light sleepers and both denied that defendant ever had sexual contact with O.D. while she was sleeping in their room. They also denied that defendant ever sexually abused them, and denied ever observing him sexually abuse any child. M.I. and R.I. also testified about a trip to New Mexico defendant took them on in August 2011, so that defendant could have a liaison with a woman he met on the internet. The two girls shared a motel room with defendant and were awakened by the sound of

4

defendant having sex in the other bed with the woman he had met there. At trial, M.I. and R.I. were somewhat vague about what they saw and heard, but admitted that a social worker's account of what the sisters said was accurate.

Defendant testified and denied ever touching Lizbeth, R.I., M.I. or O.D. in a sexual or inappropriate way. When defendant got home from work at about 10:15 p.m. on August 28, 2011, M.I. and R.I. were asleep in their room and Lizbeth's children were asleep in the living room, but Lizbeth was not there. Lizbeth had not returned by the time defendant finished showering. Defendant went to sleep in his room. Waking up at about 1:00 or 1:30 a.m., defendant went to the kitchen for a drink of water, and then went into the living room to see if Lizbeth had returned. When he did not see her asleep on the living room floor, defendant looked out the window to see if she was talking by the stairs as she sometimes did. Not seeing her there, defendant went to check if the front door was open. Just as defendant got to the door, Lizbeth opened it. Defendant said, "You scare me," then took his glass of water and returned to his bedroom. Defendant denied that he had been lying next to O.D. Defendant awoke the next morning at 6:00 a.m. to take R.I., M.I. and O.D. to school. Lizbeth would not speak to defendant, except to tell him that O.D. had walked to school. While driving with R.I. and M.I. to school that morning, defendant encountered O.D. walking; she accepted his offer of a ride. Defendant dropped O.D. and M.I. off at their school, and R.I. off at her school. During the day, defendant followed his usual habit of calling Lizbeth to check on his daughters, but she did not answer her phone or return his more than 20 calls. When defendant arrived home that night, the apartment was empty. Defendant felt scared, much like when his wife left him. He was not afraid because he had done anything to O.D., he was just afraid because his wife had left him, he had financial problems and cancer. So he got in his car and started driving, and the next thing he knew he was in Arizona and then New Mexico. He felt so badly about himself, that he did not want to think of M.I. and R.I., except to assume that their mother would come back to take care of them. Defendant did not call anyone in his family for the next several months, because he did not want them to know how he was destroying himself. When interviewed by the police, defendant falsely said that he

5

sexually abused O.D. because the officers promised he could see his daughters if he did so, and promised a lighter sentence if he admitted to certain things. Defendant came to believe that the only way out was to falsely confess to some things, but not others. Defendant did not know that the interview was video recorded.

Defendant admitted going to New Mexico to meet a woman. He brought R.I. and M.I. because he did not have confidence that Lizbeth would be able to take care of them and her own children. The woman he met in New Mexico spent just one night in the hotel room he shared with his daughters. At about 2:00 or 3:00 a.m., they had sex. Defendant believed that his daughters were asleep the whole time.

## DISCUSSION

A.    *Defendant's* Miranda *Waiver Was Knowing And Voluntary*

Defendant contends the trial court erred in denying his motion to suppress the statement he made to the police in December 2012. He argues his Fifth Amendment rights were violated because his *Miranda* waiver was not voluntary for the following reasons: (1) the waiver was tainted by improper pre-advisement "softening up" tactics; (2) he was tricked into waiving his rights because the police minimized those rights; and (3) the waiver was in exchange for a promise of leniency. We find no error.

### 1.    The *Miranda* Rule and Standard of Review

The *Miranda* rule creates a generally irrebuttable presumption that any statement made by a defendant not previously advised of his or her *Miranda* rights was not voluntary and may not be used as evidence in the prosecution's case-in-chief. (*United States v. Patane* (2004) 542 U.S. 630, 639.) The rule applies only to statements made in response to questioning initiated by the police. The rule is not triggered by "small talk" with a suspect "as long as the speech would not reasonably be construed as calling for an incriminating response. [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 387 (*Gamache*) [inquiring about the suspect's military service was not "interrogation" for

6

purposes of *Miranda*].) Questions intended to obtain biographical information and not incriminatory responses are also exempted from the rule. (*People v. Williams* (2013) 56 Cal.4th 165, 187 (*Williams*).)

The prosecution must establish a valid *Miranda* waiver "by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation. [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1171.) No express waiver is necessary. An implied waiver occurs when a defendant is advised of his rights, indicates he understands those rights, and then responds to police questions without requesting an attorney. (*People v. Nelson* (2012) 53 Cal.4th 367, 375.) A suspect who responds to "unwarned yet uncoercive questioning" may later waive his rights and confess after being given a proper *Miranda* warning. (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1368.) But police may not deliberately engage in a two step-process of questioning the suspect to elicit a confession, then giving the *Miranda* warnings and questioning the suspect a second time. (*Missouri v. Seibert* (2004) 542 U.S. 600, 617, 622.)

A waiver elicited by an express or implied promise of leniency is not voluntary; threats of harsh punishment are treated as promises of leniency. (*People v. Cahill* (1994) 22 Cal.App.4th 296, 311.) However, there is no *Miranda* violation where police simply urge the suspect to tell the truth and factually outline the benefits that may flow from confessing. (*People v. Holloway* (2004) 33 Cal.4th 96, 117 [fine line between describing benefits of confessing and promising leniency].)

On review from denial of a motion to suppress, the appellate court must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. (*People v. Camino, supra*, 188 Cal.App.4th at pp. 1370-1371.) We independently determine from the facts found whether the challenged statement was illegally obtained. (*Ibid.*)

7

## 2.      Factual Background

After being arrested in New Mexico and extradited to California, defendant arrived at the El Monte police station at about 9:00 or 10:00 p.m. on December 13, 2011. That night, defendant spoke to Detective Pitts with the help of another officer who acted as an interpreter. Pitts told defendant that he would be interviewed the next day and asked if defendant wanted to talk to someone on the telephone or to an attorney. Defendant asked to speak to his daughter, A.I., so that she could obtain an attorney for him. Defendant gave Pitts A.I.'s telephone number with the understanding that Pitts would make the call. Defendant never asked anyone about the status of the call to A.I. There was a telephone in defendant's jail cell from which he attempted to make a call, but defendant could not understand how the phone worked so he hung up and did not try again. Pitts testified that defendant asked for neither a phone call nor for an attorney during their initial meeting the night of December 13. The trial court found that defendant did not unequivocally invoke the right to counsel and defendant does not challenge that ruling.

When Detectives Pitts and Molina interviewed defendant on December 15, defendant spoke some English, but for the most part Molina translated. The interview began with Molina giving defendant a phone so that he could call one of his daughters. Defendant's side of the call was recorded.[4] Apparently speaking to Lizbeth, defendant states: "So it's not, it's not the first time [O.D.] lied. Remember how she lied about your mother at school. She, she went around saying all those things. But everybody knows that already, okay?" Defendant also states, "Because I know what that girl is capable of, okay? And if you think I touched your daughter, I'm sorry. I didn't touch her. Honest." After the call ends, the officers verified defendant's name and address, the names of his daughters and the people living in apartment 207, as well as defendant's employment

---

[4]      *Miranda* is not applicable to surreptitious taping of a conversation that does not involve police interrogation. (*People v. Jefferson* (2008) 158 Cal.App.4th 830, 841; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 757-758 [no *Miranda* violation where police officers secretly taped conversation between suspect and his father].)

history. After Pitts told defendant that his job is not to arrest people, but to take the arresting officers' report and try to find out the truth, the officers gave defendant his *Miranda* warning in Spanish and English. Defendant stated that he understood his rights; he did not ask for an attorney. During the ensuing interview, the officers told defendant that O.D. admitted pursuing a sexual relationship with defendant and that defendant never forced her to do anything. Defendant agreed that O.D. "came after" him. He initially denied ever touching O.D. inappropriately. But eventually, the following colloquy occurred:

> "[Molina:] . . . Roberto, how many times has it happened with her?
> [Defendant:] I don't know.
> [Molina:] More than five?
> [Defendant:] No.
> [Molina:] Fewer than five? How many times?
> [Defendant:] Four or three times.
> [Molina:] Four or three times? And those four or three times what did you do to her? Hmm?
> [Defendant:] Nothing, I'd just put my hand there and I, the way she told me to."

Over the course of the interview, defendant described four occasions on which he touched O.D., but adamantly denied that he raped or sodomized her.

### 3. "Softening Up" Tactics

Defendant contends his *Miranda* waiver was not voluntary because it resulted from the detectives' "softening up" tactics, including arranging for defendant to talk to his daughter, and then engaging him in small talk about his general background, before advising him of his rights. We disagree.

A purported waiver of *Miranda* rights which "results from a clever softening-up of a defendant" is by law involuntary. (*People v. Honeycutt* (1977) 20 Cal.3d 150, 160-161 (*Honeycutt*); see also *People v. Munoz* (1978) 83 Cal.App.3d 993, 997 [same].) After the defendant in *Honeycutt* was arrested but before he was advised of his *Miranda* rights, the defendant and a detective with whom the defendant was familiar talked about unrelated matters for half an hour. The detective testified that he refrained from talking about the

offense, but told the defendant that the murder victim was himself a suspect in a homicide and was thought to have homosexual tendencies. Eventually, the defendant indicated he would talk about the killing. Three hours after he was arrested, the defendant was advised of his *Miranda* rights, waived them and confessed to the killing. The *Honeycutt* court observed: "When the waiver results from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary for the same reason that an incriminating statement made under police interrogation without a *Miranda* warning is deemed to be involuntary." (*Honeycutt,* at pp. 160-161.) In *People v. Scott* (2011) 52 Cal.4th 452, our Supreme Court explained that the two salient features in *Honeycutt* were that the interrogating officers (1) sought to ingratiate themselves with the suspect and (2) disparaged the victim. (*Id.* at p. 479.) Because those factors were not present in *Scott*, the court found *Honeycutt* inapplicable.

For the same reason, we find *Honeycutt* inapplicable to this case. Nothing the detectives said before advising defendant of his *Miranda* rights could be construed as disparaging O.D. And questioning defendant about his correct name, address, and similar information does not qualify as the kind of ingratiation condemned by *Honeycutt*. (See *William, supra,* 56 Cal.4th at p. 187 [questions to obtain biographical data necessary to complete the booking process are exempted from the *Miranda* rule]; *Gamache, supra*, 48 Cal.4th at p. 388 [police officer engaging in small talk that cannot reasonably be construed as calling for an incriminating response does not violate *Miranda*].) The record in this case shows no use of any improper "softening up" tactics.

### 4. Trivialization Of *Miranda* Rights

Defendant next contends his *Miranda* waiver should be deemed involuntary because the detectives trivialized those rights by telling defendant that he had already been arrested and the officers were there to find the truth and defendant's "side of the story." We once again disagree.

10

"[E]vidence of police efforts to trivialize the rights accorded suspects by the *Miranda* decision—by 'playing down,' for example, or minimizing their legal significance—may under some circumstances suggest a species of prohibited trickery and weighs against a finding that the suspect's waiver was knowing, informed, and intelligent." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1237.) In *Musselwhite*, the detective prefaced the *Miranda* advisement with the following comment: " 'Well, we don't know what you know and what you don't know and so, what we'd like to do is just go ahead and advise you of your rights before we even get started and that way, that there's no problem with any of it. Is that alright with you?' " (*Ibid*.) Rejecting the defendant's contention that this comment improperly minimized his Fifth Amendment rights, the *Musselwhite* court observed: "Given the brevity, as well as the accuracy, of Detective Bell's statement, the fact that the officers never described the *Miranda* warning as a 'technicality' or used similar words, the absence of similar comments during the course of the questioning, defendant's record of police encounters as evidenced by two prior felony convictions, the likelihood he was aware he was a suspect in a murder investigation . . . we conclude the record fails to support defendant's claim that the importance of his *Miranda* rights was misrepresented by the detectives and that he was thereby 'tricked' into waiving them." (*Id*. at p. 1238.)

In *People v. Johnson* (2010) 183 Cal.App.4th 253, the court held that the police did not misrepresent the significance of the robbery and felony-murder suspect's rights "by referring to them as 'clear[ing] a technicality,' describing the interview as a chance for [the supect] to get answers, encouraging her to talk freely and to ask any questions, not telling her the statements 'will' be used in court, and by not asking her if she wished to waive her rights." (*Id*. at p. 294.) In that case, it was clear from the record that the suspect "understood the severity of the situation and the seriousness of the *Miranda* rights the detectives provided her." (*Id*. at p. 295.)

Here, there is no evidence that the detectives tried to trick defendant into waiving his *Miranda* rights by minimizing. The detectives never described the *Miranda* advisement as a mere technicality. Like the defendant in *Johnson*, defendant here

11

understood the severity of his situation – he knew he was suspected of abusing his granddaughter – and from that it is reasonable to infer that he understood the seriousness of his *Miranda* rights.

### 5. Promises of Leniency

Defendant next contends promises of leniency made throughout the post-advisement interview render his *Miranda* waiver involuntary. He argues that Pitts and Molina "sought to minimize the alleged fondling [of O.D. by defendant] and to suggest that his admission to digital penetration . . . would expose him to minimal penal consequences – unlike rape or penile penetration that would result in possibly 50 or 60 years in custody."[5] Again, we disagree.

The business of police detectives is investigation. To obtain a confession, they may use psychological ploys which are not so coercive that they would tend to produce a statement that is both involuntary and unreliable. (*People v. Jones* (1998) 17 Cal.4th 279, 298.) Police may discuss with the suspect "any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime." (*People v. Ray* (1996) 13 Cal.4th 313, 340.) Confessions given in the wake of a generalized, non-specific promise to help have been upheld as voluntary. (See e.g. *People v. Clark* (1993) 5 Cal.4th 950, 980-989 [no promise of implied leniency where murder suspect asks, " '[w]hat can someone get for something like this, thirty years?' " and officer replies, " '[p]robably not unless you were a mass murderer [ ]' "], disapproved of on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.); *People v. Benson* (1990) 52 Cal.3d 754, 770-782 [no implied promise of

---

**5** Defendant is incorrect that the detectives mischaracterized "digital penetration" without force as a less serious offense than "penile penetration." In fact, under the circumstances of the charged offenses, so-called forced penile penetration is more severely punished than digital penetration. (Compare § 288.7, subd. (a) [sexual intercourse or sodomy with a child 10 years of age or younger is punishable by 25 years to life in prison]; with § 288.7, subd. (b) [oral copulation or sexual penetration of a child 10 years of age or younger is punishable by 15 years to life in prison].)

leniency where officer tells murder suspect that officer has seen worse crimes and that the situation "is not the end of the line[,]" and when suspect says it is, the officer replies, "[t]here is no death penalty here."].)

Here, the statements made by the detectives to the effect that defendant would benefit in unspecified ways from telling his side of the story, and that the lack of force made his conduct less serious than if force had been used, were not the kind of statements that would produce an involuntary and unreliable confession. Accordingly, we find no error in the trial court's conclusion that defendant's *Miranda* waiver was voluntary.

B.      *No Abuse of Discretion In Admitting Evidence That Defendant Had Consensual Sex In the Presence of His Minor Daughters*

Defendant contends he was denied due process by the admission of evidence that defendant had consensual sex with a woman while M.I. and R.I. were sleeping in another bed in the same hotel room. He argues the evidence was irrelevant and, alternatively, was more prejudicial than probative under Evidence Code section 352. We find no abuse of discretion.

We review a trial court's ruling on the admissibility of evidence, including under Evidence Code section 352, for abuse of discretion. (*People v. Scott, supra,* 52 Cal.4th at p. 491.) The erroneous admission of evidence is only a violation of due process if there are no permissible inferences the jury may draw from such evidence. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.)

One exception to the general admissibility of all relevant evidence (Evid. Code, § 351) is character evidence, including specific conduct, which is inadmissible to prove the defendant's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) But there are statutory exceptions to this rule, too. The exceptions applicable here are Evidence Code sections 1102 and 1108. Evidence Code section 1108 makes evidence that a defendant accused of a sexual offense committed another sexual offense admissible. (Evid. Code, § 1108.) Evidence the defendant did *not* molest children other

13

than the victim is also admissible character evidence under Evidence Code section 1108. (*People v. Callahan* (1999) 74 Cal.App.4th 356, 375-376.)

Evidence Code section 1102, subdivision (a) makes evidence of a defendant's character admissible if offered by the defendant to prove that he acted in conformity with that character. (Evid. Code, § 1102, subd. (a)) But once the defendant introduces character evidence, the prosecution may rebut it with other character evidence. (Evid. Code, § 1102, subd. (b); *People v. Pangelina* (1984) 153 Cal.App.3d 1, 8 ["Evidence of the defendant's bad character is not admissible in a criminal case unless he first introduces evidence of his good character."]; see also *People v. Lankford* (1989) 210 Cal.App.3d 227, 231 ["[W]here the defendant in a criminal case offers evidence of specific acts affecting his credibility and good character, the prosecution is not prohibited from impeaching him with evidence of relevant specific instances of his conduct . . . ."].)

Here, the prosecutor objected to defense counsel asking Lizbeth whether defendant had ever touched her inappropriately, arguing that this was inadmissible character evidence. The trial court overruled the objection after a side bar conference in which it alerted defense counsel that the question may open the door to the prosecutor eliciting evidence of what happened in the New Mexico motel room. Lizbeth testified that defendant never touched her inappropriately. When defense counsel later indicated she intended to ask M.I. and R.I. similar questions, the trial court reiterated that doing so might make the New Mexico hotel room incident relevant. After taking under submission defendant's relevance and Evidence Code section 352 objections to evidence of the New Mexico incident, the trial court overruled those objections. It explained that it was not admitting the evidence under Evidence Code section 1101 [character evidence inadmissible to prove conduct] or 1108 [evidence of other sexual offenses admissible to prove charged sex offense]. Without referring specifically to Evidence Code section 1102, subdivision (b), the trial court found the New Mexico incident was relevant to the witnesses' credibility and bias in favor of defendant. Further, the trial court found the probative value of the challenged evidence outweighed any potential for undue prejudice. (Evid. Code, § 352.)

14

We find no abuse of discretion. Since defendant was charged only with sexual abuse of O.D., M.I.'s and R.I.'s testimony that defendant did not engage in sexualized behaviors with them, and they did not see him do so with any other child, was specific act character evidence. In other words, the only relevance of this evidence was to show defendant's good character as a person who was not sexually inappropriate with children. Thus, M.I. and R.I. were reputation witnesses. As such, the prosecution was entitled to impeach them with specific act evidence that tended to prove defendant's character as a person who was sexually inappropriate in his minor daughters' presence. (See Evid. Code, § 1102, subd. (b); *Lankford, supra*, 210 Cal.App.3d at p. 240.) We find no abuse of discretion in the trial court's finding that the New Mexico incident was such evidence. Nor do we find any abuse of discretion in the trial court's conclusion that the challenged evidence was not more prejudicial than probative.

Even assuming, for the sake of argument only, that it was error to admit evidence of the New Mexico incident, we find the error harmless under any standard. O.D.'s testimony and defendant's confession were overwhelming evidence of defendant's guilt and it is not reasonably probable that the jury would have found defendant not guilty in the absence of the New Mexico evidence (*People v. Watson* (1956) 46 Cal.2d 818, 836–837), and further, any error was harmless beyond a reasonable doubt (see *Chapman v. California* (1967) 386 U.S. 18, 24).

C.     *Exclusion of Allegedly False Accusation*

Defendant contends the trial court abused its discretion in excluding evidence that R.I. did not believe O.D. when O.D. said she had sex with a boy at school.[6] He argues the evidence was relevant to the credibility of her accusations against defendant. We disagree.

---

[6]     The Reporter's Transcript refers to evidence that: "One day [O.D.] told M.I. she was *texting* a boy." (Italics added.) From the context, it is clear this is a typographical error and the issue was evidence that O.D. claimed to be having *sex* with a boy.

In determining the credibility of a witness, the trier of fact may consider the witness's "character for honesty or veracity or their opposites." (Evid. Code, § 780, subd. (e).) A victim's claim that she has been sexually assaulted in the past by another man "would have no bearing on her credibility unless it was also established that those prior complaints were false." (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457; see also *People v. Alvarez* (1996) 14 Cal.4th 155, 201 [defense counsel's speculation that victim's prior complaint was false is not credible evidence]; *People v. Waldie* (2009) 173 Cal.App.4th 358, 363-364.) Evidence of the sexual conduct of the victim (i.e. "complaining witness") may be admissible to attack the victim's credibility, but only upon written motion of the defendant, accompanied by an affidavit. (Evid. Code, § 782.)

Here, among the evidence discussed at a pre-trial Evidence Code section 402 hearing, was that R.I. did not believe O.D.'s statement that she had sex with a boy at school. Defense counsel explained that the evidence was not offered to prove the truth of the matter (i.e. that O.D. actually had sex with a boy); rather, it was offered to prove O.D. had a character trait for fabricating sexualized conduct. Therefore, defendant concluded, Evidence Code section 782 was not applicable. The trial court excluded the evidence for failure to comply with the procedures set forth in Evidence Code section 782: "[R]egardless of whether you believe it to be true or not true, it is sexual conduct. And it's sexual conduct that one of the aunts would be testifying that [O.D.] said she did this and that's sexual conduct." It alternatively found the evidence inadmissible under Evidence Code section 352: "[I]n this case all we know is an aunt said she said it. Whether she said she did it or not, it doesn't prove she's lying because who knows whether she did it or not. It's sort of circular."

We find no abuse of discretion. As in *Alvarez, supra*, any impeachment relevance of O.D.'s statement that she had sex with a boy was premised on its supposed falseness. But the only evidence that the statement was false was that R.I. did not believe it. R.I.'s belief is not sufficient to support defendant's assertion that the statement was false. Further, defendant did not have the right to question O.D. to establish the falseness of her

claim. (See *Alvarez, supra*, 14 Cal.4th at p. 201 [defendant not entitled to question victim to establish falseness].)

D.     *Convictions For Continuous Sexual Assault and Aggravated Sexual Assault*

Defendant contends, and the People agree, that defendant cannot be convicted of both aggravated sexual assault of a child in violation of section 269, subdivision (a)(5) (count 1) and also continuous sexual abuse in violation of section 288.5 (count 3), because both crimes were found to have occurred during the same time period. (§ 288,5, subd. (c); *People v. Johnson* (2002) 28 Cal.4th 240, 248.) But the parties do not agree on the proper remedy. Defendant contends the section 269, subdivision (a)(5) conviction should be dismissed in accordance with the "special over the general" rule. The People counter that the section 288.5 conviction should be dismissed because it carries a less severe sentence.

As both parties agree, the remedy is to vacate one of the convictions. (*People v. Torres* (2002) 102 Cal.App.4th 1053, 1059 (*Torres*).) In deciding which conviction to vacate, the *Torres* court expressly rejected the "special over the general" rule relied upon by defendant in this case. (*Id.* at p. 1058.) Rather, it held that, in making the determination, it is appropriate "that we leave appellant standing convicted of the alternative offenses that are most commensurate with his culpability." (*Ibid*.) In *Torres*, the court found dismissal of the continuous abuse conviction was appropriate because it carried a lower sentence than the specific offense. (*Ibid*; see also *People v. Alvarez, supra,* 100 Cal.App.4th at p. 1177 [prosecution could elect to dismiss § 288.5 count rather than § 288, subds. (a) and (b) counts: "It would be anomalous if section 288.5, adopted to prevent child molesters from evading conviction, could be used by those molesters to circumvent multiple convictions with more severe penalties and prior-strike consequences than available for a conviction under section 288.5."].) Also instructive are the Bench Notes to the 2012 version of CALCRIM No. 1120 [elements of continuous sexual abuse], which, citing *Torres, supra*, state: "If a defendant is erroneously convicted of both continuous sexual abuse and specific sexual offenses and a greater aggregate

17

sentence is imposed for the specific offenses, the appropriate remedy is to reverse the conviction for continuous sexual abuse. [Citation.]" (Jud. Council of Cal. Criminal Jury Inst. (2012) Bench Notes to CALCRIM No. 1120, p. 944.)

Here, the section 269, subdivision (a)(5) conviction (count 1) was punishable by 15 years to life in prison. (§ 269, subd. (b).) The section 288.5 conviction (count 3) was punishable by 6, 12 or 16 years. (§ 288.5, subd. (a).) The trial court selected the indeterminate life sentence imposed on count 1 as the base term and struck count 4 "for purposes of sentencing."[7] Thus, the trial court found an indeterminate life term was commensurate with defendant's culpability. We find no abuse of discretion in that finding, but conclude that rather than striking count 4 for "purposes of sentencing," the appropriate procedure is to dismiss count 4.

E.     *CALCRIM No. 3516*

Defendant contends he was denied his federal due process right and his state and federal right to a jury trial as a result of the trial court's failure to instruct on the alternative nature of continuous sexual abuse and specific sexual offenses occurring during the same time period, by giving CALCRIM No. 3516. We disagree.

As we have already discussed, subdivision (c) of section 288.5 precludes charging both a violation of section 288.5 and a separate discrete sexual offense against the same victim, occurring in the same period of time. (*Johnson, supra*, 28 Cal.4th at pp. 244–248.) CALCRIM No. 3516 states:

> "The defendant is charged in Count ____ with _____ and in Count ____ with _____. These are alternative charges. If you find the defendant guilty of one of these charges, you must find (him/her) not guilty of the other. You cannot find the defendant guilty of both."

---

[7]     While a trial court may dismiss a count in the furtherance of justice pursuant to section 1385, it has no authority to simply strike counts "for the purpose of sentencing." (*People v. Clancey* (2013) 56 Cal.4th 562, 573-574 [trial court " 'has no authority to substitute itself as the representative of the People in the [plea] negotiation process . . . .' [Citation.]".)

(Jud. Council of Cal. Criminal Jury Inst., *supra*, CALCRIM No. 3516.) According to the Bench Notes for CALCRIM No. 3516, when the defendant is charged with violation of section 288.5 and a specific sexual offense occurring during the same period, the trial court may either give this instruction or it may determine which conviction to dismiss pursuant to section 288.5, subdivision (c). (Jud. Council of Cal. Criminal Jury Inst., *supra*, Bench Notes to CALCRIM No. 3516, p. 1098.) Although the Bench Notes for CALCRIM No. 1120 [elements of continuous sexual abuse] state that CALCRIM No. 3516 should be given sua sponte if the defendant has been charged with continuous sexual abuse and a specific sexual offense, it also states, citing *Torres, supra*, that the appropriate remedy for failure to do so when the specific sexual offense carries a greater term is to reverse the conviction for continuous sexual abuse. (Jud. Council of Cal. Criminal Jury Inst., *supra,* Bench Notes to CALCRIM No. 1120, p. 944.) Thus, the Bench Notes for CALCRIM Nos. 1120 and 3516 make clear that a criminal defendant has a statutory right not to be *convicted* of both continuous sexual abuse and a specific sexual offense occurring during the same time period, but does not have a statutory right to have the jury decide which of those two convictions should be dismissed.

Defendant's reliance on *Hicks v. Oklahoma* (1980) 447 U.S. 343, for a contrary result is misplaced. In that case, the trial court instructed the jury that it was required to impose a 40-year sentence, which was contrary to an Oklahoma statue that gave the defendant the right to have a jury fix his punishment. (*Id.* at p. 345.) The *Hicks* court held that imposing the 40–year sentence violated the defendant's due process right to have the jury fix the length of his sentence under the state statute. (*Id.* at pp. 346–347.) *Hicks* is inapposite because in California it is the trial court, not the jury, which selects a sentence. Section 288.5, subdivision (c) mandates only that the defendant not be convicted of both continuous sexual abuse and a specific sexual offense occurring during the same period; it does not mandate that the jury select which offense should be dismissed.

19

F.	*The Restitution Fine*

Defendant contends the trial court erred in imposing a $240 restitution fine pursuant to section 1202.4, subdivision (b)(1). He argues that the fine imposed violates ex post facto principles because at the time of the charged offense, the minimum fine was $200. We find no error.

Prior to 2011, section 1202.4, subdivision (b)(1) mandated imposition of a restitution fine of no less than $200 and no more than $10,000, on every person convicted of a felony, unless the trial court found compelling and extraordinary reasons for not doing so. A fine in any amount greater than the statutory minimum, and up to the $10,000 maximum, is subject to the trial court's discretion. (*People v. Avila* (2009) 46 Cal.4th 680, 729.) A defendant's inability to pay is a factor to be considered in deciding whether to impose an amount in excess of the minimum. (Former § 1202.4, subds. (c) and (d).) The trial court is not required to make express findings as to the factors it considers. (Former § 1202.4, subd. (d).) A restitution fine that falls within the statutory range is not an unauthorized sentence, and a defendant who fails to object to such a fine forfeits the claim on appeal. (*Avila* at pp. 728-729.)

On September 29, 2011, the Governor signed Assembly Bill No. 898, which increased the minimum mandatory restitution fine to $240 "starting on January 1, 2012 . . . ." (Stats. 2011, ch. 358, § 1.) The statute remained the same in all other material respects, including subdivisions (c) and (d). The ex post facto clause prohibits legislation " 'which makes more burdensome the punishment for a crime, after its commission. . . .' " (*Collins v. Youngblood* (1990) 497 U.S. 37, 42.) "A restitution fine qualifies as punishment for purposes of the prohibition against ex post facto laws." (*People v. Saelee* (1995) 35 Cal.App.4th 27, 30.) Thus, where the current version of a statute provides for a greater restitution fine than the version of that statute in effect at the time of the defendant's offense, the ex post facto clause requires the trial court to impose a restitution fine pursuant to the version of the statute in effect at the time of the defendant's offense. (See *id*. at pp. 30–31.)

20

Here, defendant was convicted of aggravated sexual assault occurring on or between July 5, 2007 and August 29, 2011. Accordingly, the prior version of section 1202.4, subdivision (b)(1) was applicable and the trial court could not impose a restitution fine of less than $200, or greater than $10,0000. Without defense objection, the trial court imposed a $240 restitution fine. Because that fine fell within the statutory range and defendant did not object in the trial court, he has forfeited any claim that the amount was improper.

## DISPOSITION

Defendant's conviction for violating section 288.5, subdivision (a) (count 3) is vacated and the charge is dismissed. In all other respects, the judgment is affirmed.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.

21